UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ZURICH AMERICAN INSURANCE
COMPANY,

              Plaintiff,

    v.

KEATING BUILDING CORPORATION,
et al.,

             Defendants.

HON. JEROME B. SIMANDLE

Civil Action
No. 04-1490

**OPINION**

---

APPEARANCES:

Philip C. Silverberg, Esq.
William D. Wilson, Esq.
Mark S. Katz
MOUND, COTTON, WOLLAN & GREENGRASS
60 Park Place
Newark, NJ 07102
    Attorneys for Plaintiffs Zurich American Insurance Company

David Goodwin, Esq.
Stephen Goldberg, Esq.
Monika Lee, Esq.
HELLER EHRMAN, LLP
333 Bush Street
San Francisco, CA 94104-2878
    -and-
John T. Wolak, Esq.
Michael R. Griffinger, Esq.
GIBBONS, P.C.
One Gateway Center
Newark, NJ 07102-5310
    Attorneys for Defendants Aztar Corporation and Adamar of New
    Jersey, Inc. d/b/a Tropicana Casino and Resort

**SIMANDLE**, District Judge:

    This matter is before the Court upon cross-motions for

partial summary judgment by Plaintiff Zurich American Insurance

Company ("Zurich") and Defendants Aztar Corporation and Adamar of

New Jersey, Inc. d/b/a Tropicana Casino and Resort (collectively, "Aztar").  This declaratory judgment action arises from a dispute over the payment of insurance proceeds for losses suffered by Aztar after a serious construction accident at the Tropicana Hotel and Casino (the "Tropicana") in Atlantic City, New Jersey in which a large portion of a garage collapsed.  Zurich filed this action as a way to assist the parties in resolving certain disputes that developed during the course of the claims adjustment process.

The parties raise four issues in these cross-motions. First, the Court is asked to resolve whether the costs associated with removing the damaged remains of the collapsed portion of the garage constitutes "costs to remove debris" -- such that it would be subject to the insurance policy's debris removal sublimit -- or "demolition," which would not be subject to the insurance policy's debris removal sublimit (discussed in Section III.A, infra).  Second, the Court is asked to resolve the proper method to calculate the debris removal sublimit.  Third, the Court is asked to determine whether the policy covers additional costs Aztar paid related to the so-called "forensic debris removal" (discussed in Section III.B, infra).  Finally, the parties seek clarification regarding whether the delay-driven increases in construction costs incurred by Aztar in completing the expansion

project are covered under the insurance policy (discussed in Section III.C, infra).

For the reasons discussed below, the Court will grant in part and deny in part Zurich's motion for partial summary judgment and grant in part and deny in part Aztar's motion for partial summary judgment.  Specifically, on the issue of the scope of the "Debris Removal" clause, the Court finds in favor of Aztar and holds that the only costs that are subject to the "Debris Removal" sublimit in the builders risk policy are the costs of removing debris from the property and transporting it away from the site.  Because the Court grants Aztar's motion regarding the scope of the Debris Removal clause, this Court need not address the issue of the calculation of the Debris Removal sublimit.  The Court will grant Zurich's motion for partial summary judgment on the issue of whether Zurich must pay the extra costs associated with the "forensic debris removal," finding these costs are not covered.  Finally, the Court grants Aztar's motion for partial summary judgment on the issue of whether Zurich must pay the extra costs that Aztar paid to complete the project and holds that Zurich cannot escape paying the extra costs that Aztar paid to complete the project solely on

the ground that the costs involve work at the project away from
the immediate area of the collapse.[1]

I.   **BACKGROUND**

   A.   **The Collapse of the Tropicana Expansion**

   Aztar contracted with Keating Building Corporation
("Keating") for Keating to serve as the general contractor on a
major expansion project at Aztar's Tropicana Hotel and Resort in
Atlantic City, New Jersey (the "Project").  Specifically, Aztar
contracted for Keating to build a twenty-seven-floor expansion
which would include retail, dining and entertainment space on the
first three floors, followed by a seven-level parking garage,
followed by seventeen floors of hotel rooms.  Aztar and Keating
expected to complete the project by the end of the first fiscal
quarter of 2004.[2]

   On October 30, 2003, as the Project was well underway,
portions of six floors of the structure collapsed.  The collapsed
section came to rest on top of the three-level retail, dining and

_____

   [1]  The Court notes that the parties have and continue to
actively pursue settlement discussions to resolve these issues.
In fact, after the filing of these cross-motions but prior to
oral argument, the parties informed the Court that they resolved
a fifth issue originally presented to the Court.  (Letter from
David Goodwin to the Court, dated October 17, 2006.)  As the
Court stated at the conclusion of oral argument, counsel and the
parties should be commended on their efforts to settle these
disputes prior to filing a declaratory judgment.

   [2]  Under the Design Build Construction Agreement between
Keating and Aztar, Keating was obligated to complete the project
for a fixed price of $173,254,000.

entertainment complex.  The accident resulted in the death of
four construction workers (and the injury of numerous others),
significant property damage and delay losses.  According to
Aztar, the accident brought construction of the entire project to
a halt and, for nearly three months, work on the Project was
limited to emergency measures.  Keating then devised a demolition
plan that attempted to minimize further damage and maximize
preservation of the usable portions of the building.  To this
end, Keating contracted with Bradenburg Industrial Services
Company to assist in the engineering task of planning to demolish
and dismantle the damaged floors and preserve, where appropriate,
the undamaged portions of the structure.  Next, Keating
substantially revised the schedule for completion of the Project,
meaning that all synchronized work needed to be rescheduled and
re-ordered.  Because of the accident, Aztar experienced a nearly
eight-month delay, with construction of the building not being
completed until the end of November 2004.  Aztar claims that, due
to the dismantlement, demolition, debris removal and re-
construction required after the accident and the delay caused by
the accident, the cost of the Project ballooned from $225 million
to over $300 million.

   B.   **The Insurance Policy**

   Before beginning construction on the Project, Zurich and
Aztar entered into an insurance agreement in which Zurich issued

a "builders' risk" insurance policy to Aztar covering Aztar, its

operating entity Adamar of New Jersey, Keating and Keating's

subcontractors for losses arising out of the accident.[3]  (Ex. C

to the Certification of Louis Chiafullo (the "Policy")).  The

Policy provides "all risks" insurance in two parts.

### 1.  Property Coverage

First, the policy contains "property" coverage, insuring

Aztar, Keating and Keating's subcontractors.  The Policy states:

> This policy, subject to the terms, exclusions,
> limitations and conditions contained herein or endorsed
> hereto, insures against all risk of direct physical loss
> or damages to Insured Project . . . .

(Policy at AZINS 00539.)  Under the Policy, the "Valuation" of

the "direct physical loss or damages" to property under

construction shall be:

> Costs to repair or replace the property lost or damaged
> at the time and place of loss with material of like kind
> and quality less betterment including contractor's
> reasonable profit and overhead . . . .

(Id. at AZINS 000548).  The Policy expressly excludes, however,

any damage or expense "caused directly or indirectly and/or

contributed to, in whole or in part" by "consequential loss,

damage or expense of any kind or description including but not

limited to . . . penalties for non-completion, delay in

---

[3]  A builders' risk policy protects owners and contractors
from losses that occur during construction.  The builders' risk
policy at issue here is Zurich Policy No. IM 3709810.

completion, or non compliance with contract conditions . . . ."
(Id. at AZINS 000541).

The Property Coverage also contains a provision with respect
to "Debris Removal."  Specifically, this provision states:

Debris Removal: . . . in the event of direct physical loss
or damage insured hereunder and occurring during the policy
period, the Company will pay the following necessary and
reasonable costs:

(1) costs to remove debris being an insured part of the
property from the project location of the insured;
and/or

(2) costs of cleanup, at the project location of the
insured, made necessary as a result of such direct
physical loss or damage.

(Id. at AZINS 00540.)  Debris Removal costs, however, are subject
to a Debris Removal sublimit.  (Id. at AZINS 00537.)
Specifically, the Debris Removal sublimit is "25% of the amount
of insured physical loss or damage."  (Id.)

### 2.   Delay in Completion Endorsement

Second, the policy  contains a "Delay in Completion"
endorsement.  (Policy at AZINS 000551.)  This endorsement insured
Aztar (but not Keating or its subcontractors) against the loss of
gross earnings, rental income and "soft costs/additional
expenses" associated with a delay in the building's construction
schedule.  (Id.)

The Policy also has a "blanket" limit of liability of $200
million per occurrence as well as various "sublimits" of
liability that apply to specific losses (besides the "Debris

Removal" sublimit).  (<u>Id.</u> at AZINS 00537.)  The Policy is
Zurich's standard proprietary form, which it sold to Aztar on a
take-it-or-leave-it basis.

     **C.**   **<u>The Claims Adjustment Process</u>**

     Aztar notified Zurich about the accident immediately.
Representatives and consultants from Zurich arrived at the
Project site the day after the accident.  At the request of and
with the assistance of Zurich, Keating instituted a system of
classification for the work performed on site and instructed its
foremen and supervisors about the classification system.
Specifically, Keating assigned "insurance" job numbers to costs
that were not within the scope of the original construction
contract but resulted directly from the collapse and submitted
these expenses (referred to by the parties as "Requests for
Compensation" or "RCs") to Zurich for payment.

     According to Zurich, the RCs included the costs incurred by
Keating to remove the debris and repair the collapsed section of
the garage, as well as increased construction costs incurred by
Keating -- apart from the debris removal and repair costs --
because the entire Project took longer to complete.  Aztar
separately submitted a claim under the Delay in Completion
endorsement for various economic losses it sustained because of
the delay in completing the overall project (e.g., lost rent,

lost hotel revenue and additional interest costs attributed to the delay in completing the project).

Zurich and its accountants reviewed the RCs  Those RCs that Zurich did not immediately agree to pay were designated RCs that were "held for discussion."  Aztar and Zurich resolved many of the RCs categorized as "held for discussion" but according to Aztar, as many as $45 million of RCs "held for discussion" remain unpaid.

Overall, Aztar and Keating submitted an insurance claim for $80 million in increased construction costs resulting from the accident.  Zurich admitted coverage and paid (or agreed to pay) approximately $40 million.  Some of the money paid out was categorized by Zurich as "Debris Removal."[4]  Zurich announced that the RCs for Debris Removal exceeded the claimed sublimit and that Zurich would not pay above the sublimit.  As a consequence of these actions, Zurich's payments fell short of the amounts requested in the RCs and Aztar was forced to advance the funds that Keating needed to complete the Project.

---

[4]  Zurich also paid out insurance funds for RCs related to a category titled "Expediting Expenses."  The parties however, have resolved these differences and all of the materials related to the dispute over Expediting Expenses in the parties' summary judgment motion papers will be disregarded.  (Letter from David Goodwin to the Court, dated October 17, 2006.)

D.    **Procedural History**

Zurich filed this declaratory judgment action against both Keating and Aztar on March 30, 2004.  Aztar filed a counterclaim (1) seeking a declaratory judgment that Zurich is obligated to pay all losses that Aztar and Keating submitted and (2) alleging breach of contract.  Since the filing of the declaratory judgment, the parties have successfully worked out a number of the disputes that arose during the claims adjustment process.  After an unsuccessful day of mediation on the remaining issues, the parties asked Magistrate Judge Donio to postpone a second scheduled day of mediation so that the parties could file these motions for summary judgment to resolve certain legal disputes concerning damages issues.  Both Aztar and Zurich filed motions for partial summary judgment, to which both parties filed timely oppositions and reply briefs. [Docket Item Nos. 88, 95]   The Court heard oral argument on the cross-motions on November 3, 2006.[5]

_____

[5]  On February 9, 2007, counsel for Zurich wrote to this Court in order to supplement Zurich's summary judgment motion by presenting newly acquired evidence based on the February 1, 2007 deposition of Michael Williams of Keating Building Corporation. (Letter from Mark S. Katz, 2/9/07.)  Counsel for Aztar replied on February 14, 2007 objecting to Zurich's attempt to reopen and supplement the summary judgment record (Letter from David S. Goodwin, 2/14/07) to which Zurich replied on February 16, 2007. (Letter from Mark S. Katz, 2/16/07).  The evidence presented by Zurich in its February 9 letter goes to the issue of whether Zurich or Aztar appropriately calculated the "Debris Removal" sublimit.  As discussed in footnote 9 _infra_, because the Court ruled in favor of Aztar as to the scope of the "Debris Removal"

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Zurich and Aztar both moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P.  A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  See id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.[6]

_____

clause in the Policy, the issue of the proper calculation of the sublimit is no longer before the Court.  Thus, the Court need not and will not address whether to reopen the summary judgment record to allow Zurich's supplementation.

    [6] Moreover, a non-moving party must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted); see Liberty Lobby, 477 U.S. at 249-50.  Thus, if the non-moving party's evidence is a mere scintilla or is "not significantly probative," the court may not grant summary judgment.  Liberty Lobby, 477 U.S. at 249-50; Country Floors, 930 F.2d at 1061-62.

    Cross-motions for summary judgment:

    are no more than a claim by each side that it alone is
    entitled to summary judgment, and the making of such
    inherently contradictory claims does not constitute an

III. **DISCUSSION**

Both Zurich and Aztar have filed motions for partial summary judgment seeking declaratory judgment on certain issues that have remained in dispute during the claims adjustment process. Aztar argues that Zurich has inproperly refused to pay approximately $40 million in Rcs.  Specifically Zurich refused to pay more than $8.5 million in costs on the grounds that those costs are subject to already-exhausted sublimit of liability in the Policy. Second, Aztar contends that Zurich has a broad obligation to pay for all direct physical loss to the entire project and disputes Zurich's contention that it need only cover costs associated with the repair of the collapsed portion of the structure.  Such a narrow reading of the Policy, Aztar argues, would leave Aztar "bare" for approximately $30 million in costs.

---

agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1988)).

### A.   Whether the Policy Requires Zurich to Pay the Costs It has Classified as "Debris Removal"

The parties do not dispute that the demolition and dismantlement of portions of the collapsed garage took many months and Keating submitted RCs to Zurich that included $24,435,283 worth of invoices from demolition contractors associated with these tasks.  According to Aztar, Zurich's accountants improperly placed $12.6 million of the demolition and other costs into the "Debris Removal" category.  Aztar claims that Zurich is attempting to avoid paying millions of dollars of otherwise covered losses by calling costs for demolition work "Debris Removal" losses, which are subject to the already-exhausted "Debris Removal" sublimit in the Policy.  Aztar claims that Zurich made the unilateral decision that Debris Removal includes not only the expense of removing debris from the Project site, but also the substantial costs to demolish the collapsed area.  Aztar also claims that Zurich improperly included other expenses -- such as engineering costs, planning, lighting and other costs -- involved in the dismantlement process into the Debris Removal category to avoid paying these RCs.

In response to this argument (and in support of its own motion for partial summary judgment), Zurich argues that Aztar proffers an unreasonably narrow interpretation of the term "Debris Removal" and maintains that New Jersey courts have defined "debris" in insurance contracts as "the remains of

13

something broken or destroyed." See Vantage Dev. Corp. v. Am.
Env't Techs. Corp., 251 N.J. Super. 516, 532 n. 10 (Law Div.
1991).  According to Zurich, following the collapse, large
portions of the collapsed and damaged steel and concrete garage
slabs that were left hanging from the remaining structure had to
be cleared and discarded before a concrete garage slab could be
constructed.  Such remains, according to Zurich, constituted
debris as that term is defined by the New Jersey courts.  Zurich
further argues that Aztar's effort to distinguish "demolition"
from "debris removal" is artificial and unavailing.

As discussed above, the Property Coverage in the Policy
contains a provision with respect to Debris Removal.
Specifically, this provision states:

Debris Removal: Subject to the sublimit of Liability . . .
in the event of direct physical loss or damage . . . the
Company will pay the following necessary and reasonable
costs:

(1) costs to remove debris being an insured part of the
property from the project location of the insured;
and/or

(2) costs of cleanup, at the project location of the
insured, made necessary as a result of such direct
physical loss or damage.

(Policy at AZINS 00540.)  The "Debris Removal" clause is located
in the portion of the Policy covering extensions of coverage.
(Id. at AZINS 00539-40.)

1.   "Debris Removal" vs. "Demolition"

The Court finds that Aztar's definition of "Debris Removal" is reasonable and that the costs subject to the "Debris Removal" sublimit are limited to the costs of removing debris from the property and transporting it away from the Project site.  For a number of reasons, the Court finds that "Debris Removal" costs do not include, then, costs of demolition of the damaged property and related engineering expenses are not subject to the "Debris Removal" sublimit.

First, because the Policy does not define the term "Debris Removal," this Court, in interpreting the language of an insurance policy under New Jersey law, must determine the ordinary meaning of the language of the policy.[7]  Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)("the words of an insurance policy are to be given their plain, ordinary meaning"); Voorhees  v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992)).  To assist in determining the ordinary and plain meaning of

---

[7]  The Court notes that both parties have cited case law from other jurisdictions that the parties argue support their position that the terms "debris removal" and "demolition" are either (1) distinct (Aztar) or (2) synonymous (Zurich).  Because none of these precedents are binding authority on this Court, the Court will not consider any of them.  Rather, the Court will interpret the Policy according to the principles governing the interpretation of insurance policies under New Jersey law.  See Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001); Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 520 (3d Cir. 1997); Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 331-32 (1998); Owens-Illinois, Inc. v. United Ins. Co., 264 N.J. Super. 460, 4888 (App. Div. 1993).

language in an insurance policy, New Jersey courts have resorted to the use of a dictionary.  See Daus v. Marble, 270 N.J. Super. 241, 251 (App. Div. 1994)(use of dictionary to determine definition of term "forklift" in insurance policy); Killeen Trucking, Inc. v. Surplus Lines Ins. Co., 211 N.J. Super. 712, 715 (App. Div. 1986) (use of dictionary to determine definition of term "trailer" in insurance policy).  The phrase "debris removal" and the term "demolition," according to their plain meanings, are distinct.  According to The American Heritage Dictionary, the term "remove" means "[t]o move from a position occupied; to convey from one place to another."  The American Heritage Dictionary 1101 (1976).  Under this definition, the phrase "to remove debris . . ." in the Policy refers to the act of moving the debris from one location to another.  Such a definition does not include demolition, planning and engineering. The dictionary defines "demolition" as "the act or process of wrecking or destroying."  Id.  As such, the term "debris removal" is distinct from "demolition" and costs associated with demolition (i.e., not having to do directly with removing debris from the property and transporting it away) should not be subject to the Debris Removal sublimit.

     Second, in the context of this insurance contract, "debris removal" cannot include the term "demolition," as suggested by Zurich.  A finding that the term "debris removal" included

"demolition" would render the term "demolition" superfluous, a result that is contrary to New Jersey law regarding interpretation of insurance policies.  See Gunther v. Metropolitan Casualty Ins. Co., 33 N.J. Super. 101, 113 (Law Div. 1954)("No part of any contract, particularly a policy prepared with the care with which this one was prepared, should be treated as useless unless it is indeed useless.")  Indeed, when interpreting an insurance policy, "[a] court must endeavor to give effect to all terms in a contract 'and the construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.'" Linan-Faye Constr. Co. v. Housing Auth., 995 F. Supp. 520, 524 (D.N.J. 1998)(quoting Prather v. Am. Motorists Ins. Co., 2 N.J. 496, 502 (N.J. 1949)).  Here, the Policy repeatedly refers to costs associated with "demolition" and with "debris removal" separately.  For example, in the General Purpose Endorsement "Ordinance or Law: Demolition and Increased Cost of Construction" of the Policy, the Policy states:

> The following costs are not payable hereunder:
>
> 1.   Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any law or ordinance regulating asbestos material;
>
> 3.   Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any law or ordinance regulating Contaminants or Pollutants;

17

(Policy at AZINS 000556).  Use of the terms in this manner confirms that the term "debris removal" means something separate and distinct from "demolition."  To hold otherwise would be to find the term "demolition" superfluous.

Finally, if this Court had not determined that the terms "debris removal" and "demolition" were distinct and it was unclear whether the phrase "costs to remove debris . . . from the project site" referred to simply costs associated with removing debris from the Project location and carting it away or the costs associated with engineering and dismantling the damaged portion of the garage, the Court would have concluded that the phrase was ambiguous.  Such an ambiguity would be resolved in favor of the insured.[8]  Id.  Indeed, in Vantage Dev. Corp., the New Jersey

---

[8]  In their brief in opposition, Zurich argues that New Jersey's rule of insurance policy interpretation (which requires a Court to construe any ambiguity against the insurer when an insurance policy is sold on a "take-it-or-leave-it" basis) is not applicable in this case because Aztar is a sophisticated insured and a multi-billion dollar corporation that hired an experienced insurance agent to assist it in obtaining the builders risk policy.  In support of its position, Zurich cites Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87 (2004).  Benjamin Moore, however, does not preclude this Court from construing any ambiguity against the insurer.  See 179 N.J. at 102.  Indeed, Benjamin Moore holds that "only where it is clear that an insurance policy was actually negotiated or jointly drafted, and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked."  Id. (citations omitted)(emphasis added).  The Third Circuit Court of Appeals has held similarly in Pittston Co. Ultramar Am. v. Allianz Ins. Co., stating

[T]he dispositive question is not merely whether the insured is a sophisticated corporate entity, but rather

Superior Court, Law Division held that if "the language of a policy will support two interpretations, one favorable to the insured and the other favorable to the insurer, a court is obligated to apply the interpretation that favors coverage. 251 N.J. Super. 516, 522 (Law Div. 1991)(citing <u>Butler v. Bonner and Barnwell, Inc.</u>, 56 N.J. 567, 576 (1970)). Here, an interpretation of this clause in favor of Aztar and against Zurich would be warranted even if the language were not as plain as it is.

### 2.   Other Costs Zurich Characterized as Debris

Next, Aztar contends that Zurich also attempted to "toss[] a host of other costs into the "'Debris Removal' bucket," such as costs associated with electricity, engineering reviews, permits, scaffolding, elevator/manlift services and the general contractor's supervision and coordination of demolition subcontractors, and argued that the Debris Removal sublimit also

---

whether <u>the</u> <u>insurance</u> <u>contract</u> <u>is</u> <u>negotiated</u>, <u>jointly</u> <u>drafted</u> or <u>drafted</u> <u>by</u> <u>the</u> <u>insured</u>. In such instances, we conclude that the doctrine of *contra proferentum* should not be invoked to inure to the benefit of the insured.

124 F.3d 508, 521 (3d Cir. 1997)(emphasis added). Here, the Policy was a standard Zurich property insurance form that Zurich insisted on using without alteration. (Aztar's Statement of Material Facts ¶ 7; Cert. Ex. N. at 58). Indeed, Zurich has not identified any term in the Policy that Aztar or its insurance broker drafted or actually negotiated. As such, the rule of strict construction of policy terms against the insurer applies in this case.

applies to these costs.  (Aztar Br. at 19.)  Aztar maintains that these costs are not "costs to remove debris . . . from the project location" and therefore should not be subject to the Debris Removal sublimit.

The Court agrees with Aztar.  Again, interpreting the language of the Policy according to its plain meaning, the Court finds that a reasonable person would conclude that the costs of engineering plans, permits, scaffolding, and contractor's supervision are costs associated with demolition rather than with debris removal.  Such costs appear to be directed to the dismantling of damaged portions of the garage in preparation for debris to be removed from the Property location.  Debris removal consists of removing debris from the Property and transporting it to another site.  To the contrary, it is reasonable to find costs associated with the labor, specialty equipment used to load vehicles with large pieces of debris, dump trucks, and dumping and permit fees to be included as costs of Debris Removal.  Thus, costs related to engineering expenses, scaffolding, permits, contractor's supervision, skilled demolition labor or demolition consultants and with the coordination of demolition subcontractors are not costs that are subject to the "Debris Removal" sublimit.[9]

_____

[9]  Having ruled in favor of Aztar with respect to the scope and application of the "Debris Removal" provision of the Policy, the Court need not address the issue of which parties'

### B.   Whether "Forensic Debris Removal" Costs are Covered by the Policy

When the garage at the Tropicana collapsed, four construction workers were killed and twenty-one were injured.  An extensive investigation into the cause of the collapse followed, and Aztar and Keating were compelled by various government authorities and the pendency of personal injury and wrongful death actions to preserve certain sections of the debris. (Keating's Br. at Ex. 16, Rotolo Tr. at 200.)  The need to preserve evidence of the collapse resulted in certain debris removal costs in excess of what otherwise would have been incurred if more typical (and destructive) debris removal techniques had been used (these additional costs are so-called "forensic debris removal" costs).  Zurich maintains that it has identified $2,573,088 in "forensic debris removal costs" over and above the $12,622,195 otherwise incurred in the debris removal.

---

calculation of the "Debris Removal" sublimit is correct.  At oral argument, Aztar's counsel stated that, should the Court rule this way, "Aztar would be entitled to coverage for all of its reasonable and necessary costs of debris removal" and that this issue no longer arises.  (Transcript of Oral Argument, 11/3/2006, at 27-28.)  The Court takes this representation to mean that should the Court rule in favor of Aztar on the issue of the scope of the Debris Removal clause (which the Court has) the issue of the calculation of the Debris Removal sublimit becomes moot as Aztar's claims for Debris Removal would be lower than Zurich's calculation of the Debris Removal sublimit.  In other words, the Court should assume that, should the Court find in Aztar's favor on the scope of the Debris Removal sublimit, Aztar either (1) concedes that Zurich's calculation of the sublimit is correct or (2) withdraws its motion for partial summary judgment on the issue of the calculation of the debris removal sublimit.

According to Zurich, the additional costs associated with the forensic debris removal were motivated by third-party liability issues and should not be borne by Zurich.[10]  Because the Policy does not cover the costs associated with liability defense issues, Zurich argues it is not responsible for these additional costs.  Aztar argues that the Policy provides that Zurich pay for "necessary and reasonable costs" to remove debris from the project and does not exclude debris removal for purposes of preserving evidence.  According to Aztar, because Zurich is attempting to deny or limit coverage, Zurich must prove that such forensic debris removal costs were not "necessary and reasonable."  See Victory Peach Group, Inc. v. Greater N.Y. Mut. Ins. Co., 310 N.J. Super. 82, 90 (App. Div. 1998)("the burden is on the insurer to bring the case within an exclusion or limitation.")  Aztar continues, arguing that even if Zurich made a prima facie showing sufficient to satisfy its burden on summary judgment, there would be a triable issue of fact on this point because the additional costs of the forensic debris removal were both necessary and reasonable for Zurich's subrogation investigation.

The Court disagrees with Aztar and finds that Zurich is not responsible for the additional costs of "forensic" debris removal

---

[10]  Keating commenced a third-party action against its liability insurer to recover the forensic debris removal costs that Zurich refused to pay.

that are over and above the costs of standard debris removal.  As
previously explained, New Jersey law requires this Court to
interpret the Policy according to the ordinary meaning of the
language contained in it, see Zacarias, 168 N.J. at 595, and the
plain meaning of the language of the Policy is sufficient for
Zurich to satisfy its burden.  The "Debris Removal" provision in
the Policy's Extensions of Coverage provision is straightforward;
in the event of a "direct physical loss or damage," Zurich will
pay "the following necessary and reasonable costs . . . (1) costs
to remove debris . . . from the project location of the Insured."
(AZINS 00540).  Reading this clause, the Court cannot conclude
that the costs associated with "forensic debris removal" (i.e.,
non-destructive removal of certain sections of the collapsed
structure, storage of select segments of the debris as evidence,
etc.) fall within the grant of coverage afforded by the Policy.
The plain meaning of this language does not indicate that the
parties contemplated that this provision would cover (and Aztar
would be insured for) in excess of what otherwise would have been
incurred if more typical (and destructive) debris removal
techniques had been used.  Absent any language indicating
coverage for such extraordinary costs associated with forensic

removal, the Court finds that the Policy does not cover Aztar's forensic debris removal expenses.[11]

In addition, the Policy issued by Zurich does not provide coverage for costs associated with liability defense issues.  A conclusion by this Court that Zurich is responsible for forensic debris removal costs associated with Aztar and Keating's investigation would run afoul of Third Circuit law holding that property insurance is first-party coverage that is intended to compensate the insured for damages to the insured's own property, not third-party insurance coverage.  See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002); See Ostrager & Newman, Handbook on Insurance Coverage Disputes § 21.01[a] (13th ed. 2006).  Specifically, in Port Auth. of N.Y. & N.J., the Third Circuit stated:

> The primary aim of third-party insurance is to defend and indemnify insureds against liability claims made against them as a result of their own conduct.  First-

_____

[11]  Moreover, Aztar's argument that incurring such costs were "necessary" because Plaintiffs had to preserve evidence as part of Zurich's subrogation investigation and not prejudice Zurich's subrogation rights is unpersuasive.  Aztar has failed to present any evidence that it expended additional debris removal expenses and sought to preserve such forensic evidence due to Zurich's orders (i.e, that Zurich made such costs "necessary").  It is more reasonable to conclude that Aztar had its own agenda and need for preserving evidence (i.e., to defend against wrongful death and personal injury lawsuits).  In addition, the Court having found that the Policy does not provide coverage for the forensic debris removal expenses, the Court need not address whether a triable issue of fact exists with respect to whether such costs were "necessary" under the Policy.

> party coverage, on the other hand, protects against
> loss caused by injury to the insured's own property.

311 F.3d at 233.  As such, the forensic debris costs -- which
were incurred in order for Aztar and Keating to address third-
party liability issues -- are not covered by the Policy.

### C.   Whether the Builders' Risk Policy Covers the Increased Cost to Complete the Insured Project Caused by the Collapse

The parties do not dispute that, following the accident,
Keating had to formulate an entirely new construction schedule
that would accommodate dismantlement, demolition and
reconstruction work in the damaged areas of the Project and the
preservation of undamaged construction work surrounding the
damaged areas.  This new schedule called for Keating to reorder
and re-sequence work on the project, which led to Keating and its
subcontractors incurring substantial costs, having to either stay
on the job site longer than previously scheduled or come back to
the site sometimes months later to complete their work.  In
addition, the work of construction crews and subcontractors was
put on hold and work crews had to be recalled at a later date.

These factors (and others) ultimately increased the cost of
completing the Project.  Zurich has refused to pay certain of
these increased expenses.  Specifically, Zurich has earmarked
three categories of RCs that it has refused to pay: (1) "Extended
General Conditions" (e.g., administrative costs, trailers,
supplies and other costs that are not captured as direct

25

charges); (2) "Contractor's Delay" charges (e.g., costs and expenses such as idle labor and equipment, that was incurred before reconstruction could begin); and (3) "Storage, Price Increases, Etc." (e.g., increases in labor wages and building material costs, as well as storage costs that would not have been needed but for the collapse).  The Extended General Conditions, Contractor's Delay and Storage/Price Increase costs shall be referred to collectively as the "Additional Costs."

Aztar argues that it incurred the Additional Costs simply to finish the Project -- not to build anything different from, or in addition to, the original Project.  According to Aztar, the extra costs fall within the Policy's grant of coverage and are not expenses excluded from coverage.  Zurich's argument is centered on the premise that the construction delays caused by the accident are losses suffered by Keating (rather than Aztar) and that Keating's losses are not covered by the Policy.  Zurich contends that even if these costs were covered within the granting language of the Policy, they would be excluded by the exclusion provision addressing consequential losses, damages and expenses.

### 1.   Whether the Additional Costs are Within the Policy's Grant of Coverage

For Zurich to be responsible for coverage of the Additional Costs, Aztar must first demonstrate that these losses are within the Policy's grant of coverage.  According to Aztar, the

Additional Costs fall within the Policy's grant of coverage
because the Policy covers "all risks of direct physical loss or
damage," which includes coverage of all fortuitous losses for
which an insured peril is the proximate causes (unless expressly
excluded from coverage).  Zurich argues that the extra costs are
unrelated to the repair of the damaged property and that they
relate solely to the delay in completing undamaged portions of
the Project that Zurich contends would not have been incurred
"but for" the delay resulting in the collapse.  (Zurich's Opp.
Br. Ex. 18, Dep. Tr. of Williams at 216-20.)  In other words,
construction was disrupted by the collapse and the Project took
longer to build.  According to Zurich, these were Keating's delay
claims and Keating's delay claims are not covered under the
Policy because the scope of the Policy's indemnity ("Valuation
Clause") is measured by the "[c]ost to repair or replace the
property lost or damaged at the time and place of loss with
materials of like kind and quality . . . ."  (Policy at AZINS
00548.)  Thus, Zurich asserts, the scope of the indemnity only
covers repair costs to the damaged portion of the Project, not
increased costs to complete construction of undamaged property.

The Court finds that all three categories of Additional
Costs are covered by the Policy.  Under New Jersey law, this
Court must construe insurance policy provisions that grant
coverage broadly and those that limit coverage narrowly, so as to

maximize the insurance available to cover a loss.  See Vantage,
251 N.J. Super. at 523.  The Policy's grant of coverage states
that the Policy covers "all risk of direct physical loss or
damage to insured property while at the location of the Insured
Project."  (Id. at AZINS 00539.)  According to New Jersey law, an
"all risk" policy like the Policy at issue in this case covers
all fortuitous losses that an insured peril proximately causes
(unless an exclusion applies).  See Ariston Airlines & Catering
Supply Co., Inc. v. Forbes, 211 N.J. Super. 472, 479 (Law Div.
1986).  In Ariston, a New Jersey trial court cited approvingly to
the American Law Reports section titled "Coverage Under 'All
Risks' Insurance" and stated "a policy of insurance insuring
against 'all risks' is to be considered as creating a special
type of insurance extending to risks not usually contemplated,
and recovery will usually be allowed, at least for all losses of
a fortuitous nature," unless excluded.  Id. (citing 88 A.L.R. 2d
1122, 1125 (1983)).

    In addition, as Aztar points out, the Policy does not
restrict coverage only to the area of the Project where the
accident occurred.  To the contrary, the Policy insures physical
damage to the insured property at the "Insured Project."  The
Policy defines the "Property Insured" to include all property
used to construct the "Insured Project" and "Insured Project" as
"the work which the Insured is contractually obligated to perform

28

in accordance with the contract documents."  The "work"
referenced in this definition is defined as the "construction of
a 27 Story - 350' High Multi-[U]se Non-Combustible Building."
(Aztar's Statement of Material Facts ¶¶ 10-12.)

Zurich's argument that the Policy's Valuation Clause limits
coverage to only repair costs, and not increased costs to
complete construction of undamaged property, are unpersuasive.
The Policy's Valuation Clause states that the Policy covers only
costs to "repair or replace the property lost or damaged at the
time and place of loss with materials of like kind and quality
less betterment . . . ."  However, the Court finds that from the
perspective of an ordinary insured reading the Policy -- the
perspective from which this Court must view the language of the
Policy, see Daus v. Marble, 270 N.J. Super. 241, 251 (App. Div.
1994) -- the term "property lost or damaged" as a result of the
collapse refers to the entire structure, not simply to the
location of the collapse.

In addition, if Zurich had intended to limit its obligations
under the Policy to only obligations to repair costs for the
damaged portion of Project, Zurich, who sold the Policy on a
"take-it-or-leave-it" basis, could have used language imposing
this type of coverage restriction.  Under New Jersey law, when
evaluating the insurer's claim as to the meaning of language in a
policy, this Court is permitted to consider "whether alternative

or more precise language, if used, would have put the matter

beyond reasonable question." Mazzilli v. Accident Cas. Ins. Co.,

35 N.J. 1, 7 (1961).  In fact, another insurance form used by

Zurich states that Zurich will pay for losses required to

"rebuild, repair, or replace such part of the property herein

described as has been damaged or destroyed." Doswell Ltd.

Partnership v. Va. Elec. & Power, Co., 1998 WL 972244, at *2 (Va.

Cir. 1998).  Because Zurich knew how to (but did not) issue a

policy with this limiting language, the Court cannot now limit

the language in the Policy in such a way.

> **2.    Whether the Extra Costs are Excluded from the Policy's Exclusion of "Consequential Losses"**

Having found that the extra costs fall within the Policy's

grant of coverage, the Court must now analyze whether the policy

contains a specific provision expressly excluding the loss from

coverage.  Zurich argues that the extra costs are expressly

excluded from the Policy as "consequential losses."  The Policy

states:

> This policy shall not pay for any loss, damage or
> expense caused directly or indirectly and/or
> contributed to, in whole or in part, by any of the
> following excluded perils . . .

> > A.    **Consequential loss, damage or expense of any kind
> > or description including but not limited to** loss
> > of market or delay, liquidated damages,
> > performance penalties, penalties for non-
> > completion, **delay in completion,** or non-compliance
> > with contract conditions, whether caused by a
> > peril insured or otherwise, however the foregoing

                    shall not exclude Delay in Completion Coverage
                    when it is endorsed to the Policy.

(Policy at AZINS 000541)(emphasis added).  According to Zurich,
the extra costs -- which were incurred largely as a result of
construction delays due to the collapse -- are the epitome of
consequential losses as they are losses that "do[] not flow
directly and immediately from the act of the party, but only from
some of the consequences or results of such act[s]."  Black's Law
Dictionary (6th ed. 1990).

     "When dealing with clauses of exclusion, strict
interpretation is required."  See Vantage, 251 N.J. Super. at
523.  Moreover, the insurer bears the burden of proving that a
provision limiting coverage (either an exclusion or limitation)
applies to the particular loss at issue.  Princeton Ins. Co. v.
Chunmuang, 151 N.J. 80, 95 (N.J. 1997)("In general, insurance
policy exclusions must be narrowly construed; the burden is on
the insurer to bring the case within the exclusion"); Victory
Peach Group, Inc. v. Greater N.Y. Mut. Ins. Co., 310 N.J. Super.
82, 90 (App. Div. 1998).  Here, Zurich has failed to satisfy its
burden that the consequential loss exclusion applies to the
Additional Costs for several reasons.

     First, in New Jersey, when an insurance policy uses an
exclusion which bars coverage for losses caused by a particular
peril, the exclusion applies only if the excluded peril was the
"efficient proximate cause" of the loss.  Auto Lenders Acceptance

                                    31

Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 257 (2004)[12](noting
that the "Appleman Rule" applies in New Jersey); see also John
Alan Appleman, Insurance Law & Practice, § 3038, at 309-11
(1970); Great Am. Ins. Co. v. Lerman Motors, Inc., 200 N.J.
Super. 319, 326 (App. Div. 1984)("A construction which excludes
consequential losses from coverage under a general liability
policy is not a reasonable interpretation of a policy which
insures against all damages . . . nor is it one which comports
with the reasonable expectation of an average lay purchaser of
insurance as to the coverage afforded by the policy.")  However,
coverage is available if the covered peril was the efficient
proximate cause of a loss and an excluded peril merely occurred
in the chain of events that followed.  Auto Lenders Acceptance
Corp., 181 N.J. at 257.  Here, the parties do not dispute that
the efficient proximate cause of Aztar's loss was the collapse or
that the collapse is a covered peril.  Applying the Appleman
Rule, even if an excluded peril (a "consequential loss") was
involved in the chain of events that led to the loss (the

---

[12]   In Auto Lenders Acceptance Corp. v. Gentilini Ford,
Inc., 181 N.J. 245, 257 (2004), the New Jersey Supreme Court held
that "[w]here a peril specifically insured against sets other
causes in motion which, in an unbroken sequence and connection
between the act and the final loss, produces the result for which
recovery is sought, the insured peril is regarded as the
proximate cause of the entire loss . . . [and] recovery may be
allowed . . . where the insured risk itself set into operation a
chain of causation in which the last step may have been an
excepted risk."

Additional Costs), coverage is still available because a covered peril (the collapse) was the efficient proximate cause and such an exclusion cannot bar coverage as long as the efficient proximate cause is covered.

Second, interpreting the exclusionary language narrowly as it must, see Vantage, 251 N.J. Super. at 523, the Court finds that the consequential loss exclusion does not apply to the losses at issue.  Here, the Policy lists the specific types of losses that are excluded as "consequential" losses.  The types of losses listed in the exclusion -- "loss of market or delay," "liquidated damages," "performance penalties," and "penalties for non-completion, delay in completion, or non-compliance with contract conditions" -- are purely economic losses that are separate and apart from regular construction costs.  Extending the exclusion of "consequential losses" beyond purely economic losses to include regular construction costs incurred to simply finish the Project is unwarranted and impermissible in light of New Jersey law directing courts to interpret exclusionary language narrowly.

Finally, the Court addresses one argument raised by Zurich in support of its position that the Additional Costs are either not covered by the Policy's grant language or excluded by the consequential loss exclusion.  First, in arguing that the exclusion bars coverage, Zurich points to an exclusion for "delay

33

in completion." At first blush, Zurich's argument appears persuasive, stating that the consequential loss exclusion covers delays in completion. However, the exclusion does not appear in the manner Zurich presents it. Rather, the exclusion excludes only losses caused by the "perils" of "consequential loss, damage or expense" and gives several examples of excluded losses, including "penalties for non-completion, delay in completion, or non-compliance with contract conditions." Thus, the exclusion does not state that a delay in completion would be a consequential loss but that the penalties associated with a delay in completion would be a consequential loss. Here, Aztar is not seeking coverage for a penalty, but for Additional Costs associated with the delay in completion.

## IV.   CONCLUSION

For the reasons expressed in this Opinion the Court will (1) grant in part and deny in part Zurich's motion for partial summary judgment and (2) grant in part and deny in part Aztar's motion for partial summary judgment as follows:

- On the issue of the parties' differing interpretations of the scope of the Policy's "Debris Removal" clause, the Court will deny Zurich's motion for partial summary judgment and grant Aztar's motion for partial summary judgment. Specifically, the Court holds that the only costs that are subject to the "Debris Removal" sublimit in the Policy are the costs of removing debris from the property and transporting it away from the site - not the costs of demolishing the damaged property or related engineering expenses;

- On the issue of the calculation of the "Debris Removal"  , the Court having granted Aztar's motion for partial summary judgment as to the scope of the "Debris Removal" clause and based on Aztar's counsel's representations to the Court at oral argument as discussed in footnote 9, <u>supra</u>, this Court need not decide this issue as "Aztar would be entitled to coverage for all of its reasonable and necessary costs of debris removal."  (Oral Argument Tr. at 28.);

- On the issue of whether Zurich must pay the extra costs associated with the "forensic debris removal," the Court will grant Zurich's motion for partial summary judgment and deny Aztar's motion.  The Court finds that Zurich need not pay the extra costs associated with the "forensic debris removal" and there is no triable issue of fact with respect to whether Zurich must pay these costs; and

- On the issue of whether Zurich must pay the Additional Costs that Aztar paid to complete the project, the Court will deny Zurich's motion for partial summary judgment and grant Aztar's motion.  Specifically, the Court holds that Zurich must pay the extra costs that Aztar paid to complete the project, without regard to whether the costs involve work at the project away from the immediate area of the collapse.

The accompanying Order is entered.


**March 22, 2007**                    **s/ Jerome B. Simandle**
DATE                                  JEROME B. SIMANDLE
                                      United States District Judge